**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

VINCENT ZAGARI, *et al.*

                    Plaintiffs,

       -vs-

INTERNATIONAL UNION OF ELECTRONIC,      DECISION AND ORDER
ELECTRICAL, SALARIED, MACHINE &amp;         05-CV-6608 CJS (F)
FURNITURE WORKERS, AFL-CIO, and its
LOCAL 509 (IUE-CWA, LOCAL 509),

                    Defendants.

---

**APPEARANCES**

For plaintiff:               Donna Marianetti, Esq.
                            1511 Providence Drive
                            Webster, NY 14580
                            585-265-4830

For defendants:           Matthew J. Fusco, Esq.
                            Chamberlain, D'Amanda, Oppenheimer &amp;
                            Greenfield, LLP
                            1600 Crossroads Building
                            Two State Street
                            Rochester, NY 14614
                            585-232-3730

**INTRODUCTION**

    This case involves a dispute concerning a collective bargaining agreement, and now is before the Court on Defendants' motion (# 20) to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(6), 9(a) and 8(b)(6). For the reasons stated below, the motion is denied.

## FACTUAL BACKGROUND

This case is joined with several others[1] in which Plaintiffs[2] allege similar wrongful conduct on the part of Defendants. Plaintiffs' counsel states in her memorandum of law that,

> In total, the undersigned plaintiffs' counsel filed thirty (30) substantially, though not identical, Complaints against the Union. The plaintiffs fall into two categories: (1) those, such as Mr. Zagari, who were actively employed by Valeo and were members of the Union at the time of [sic] the September, 2005 ratification vote took place; and (2) Those, such as plaintiff Alonci, who separated their employment within a short time prior to the September, 2005 amendment pursuant to the terms of the May, 2002 amendment to the Collective Bargaining Agreement.

(Pl.'s Mem. of Law (# 22) at 2.)

The Court will presume the following allegations from the complaint to be true for the purposes of this motion:

> 5. The plaintiff is employed by Valeo Corporation (hereinafter referred to as "Valeo" and/or "company") in the general capacity of an Assembly worker.
>
> 6. Plaintiff commenced his/her employment with Valeo on or about November 18, 1985.
>
> 7. During his/her employment with Valeo the plaintiff has been, and is currently, a member of the International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers, AFL-CIO, and its Local 509 (IUE-CWA, Local 509) (collectively hereinafter referred to as "Union").
>
> 8. By virtue of the plaintiff's payment of dues as a membership fee to belong to the Union, the Union owes the plaintiff a duty of care and the duty of fair

---

[1] Lead case: 6:05-CV-06608-CJS; member cases: 6:05-CV-6695-CJS; 6:05-CV-6728-CJS; 6:06-CV-6034-CJSCV-CJS.

[2] Although the complaints in several cases are consolidated, the facts recited in this decision refer specifically to the lead plaintiff. The parties have represented that the allegations in the consolidated actions are similar to that plaintiff's. (Stipulation and Order Extending the Time and Consolidating (Docket No. 2) at 4.) Further, although both the international and local unions are defendants, the Court will refer to the unions collectively as "the Union."

representation of plaintiff in matters pertaining to his/her employment which are encompassed within the collective bargaining agreement. The Local Union, upon information and belief, can only undertake actions on behalf of its members that are in keeping with those directives of the International Union and upon engaging in those actions does so with the backing and acquiescence of the International Union.

9. On or about July 20, 2000 the Union and the company negotiated the terms of a collective bargaining agreement which was ratified and deemed to go into effect on August 14, 2000.

10. The agreement was touted by the Union to be highly beneficial to its members and was to remain in effect through September, 2008.

11. Commencing only three short months after ratification of the collective bargaining agreement, the company started a quest to get out of its obligations pursuant to the collective bargaining agreement.

12. On December 14, 2001, presumably due to failure on the part of the company to get out of the collective bargaining agreement, the company filed for bankruptcy protection.

13. The Union described the concessions being sought by the Company as "wage concessions on average of $3.00 per hour, huge cuts in health care benefits with large out of pocket costs and severe, seniority threatening, work practice changes."

14. Subsequent to the bankruptcy filing of the Company through which it commenced a plan to repay its debt, the Union reached what it termed a "concessionary agreement" which was ultimately ratified by its membership based upon the Union's unanimous recommendation to its membership that the same be approved as an amendment to the July, 2000 agreement. Ultimately, upon information and belief, the company came out of bankruptcy within one year and nearly paid its creditors in full.

15. The concessionary agreement changed the terms of the original contract only as to those topics outlined in the "highlight booklet" that was handed out to union membership to review prior to the ratification meeting. Union members were told to bring said booklet to the ratification meeting as the union would not be handing out copies at the meeting.

16. Despite the amendment to the original Collective Bargaining Agreement, the company persisted in its scare tactics designed to caused the Union to submit to its demands. The company engaged in a virtually continuous course of banter claiming that the costs of doing business at the Rochester

facility were too high and that it would likely have to file bankruptcy declaring itself insolvent or close the plant.

17.  Upon information and belief, the company's economic condition and business prospects for the Rochester, New York facility were not as bleak as portrayed, but he [sic] Union failed to take sufficient steps to investigate the true financial picture of the company in order to remain a strong bargaining force on behalf of the employees remaining in the employment of the company.

18.  Through the use of layoffs and attrition programs permitted via the 2002 amendment to the bargaining agreement, the company held firm to a course of reducing the number of employees at the Rochester facility. In fact, through September, 2005, the work force at Valeo dwindled from it original number of approximately 3,500 employees to only approximately 510 hourly employees.

19.  Upon information and belief, during the time frame between January, 2005 and July, 2005, the company began to step up its plan to close the Rochester facility. During this time frame, Union officials were aware of Valeo's intention to close the plant at the conclusion of the collective bargaining contract which was previously September 30, 2008, but was shortened to July 31, 2008 by the May 2, 2005 Amended Contract.

20. Despite the Union's awareness of the very real possibility that Valeo was going to make good on its threat to close the Rochester facility, no genuine steps were taken by the Union to request bargaining with the company designed to offer additional concessions to the company in order to keep the facility open.

21.  Upon information and belief, the union employee numbers had decreased to a point that the dues being paid to the Union for this facility was deemed to be insignificant to the Union. Therefore, from an economic standpoint the Union did not have sufficient interest in keeping this facility open.

22. On or about July 27, 2005, Valeo officially announced its decision to close the Rochester, NY facility citing poor economic conditions impacting the automotive industry.

23. While plaintiff acknowledges that the automotive industry has suffered financially in recent years, plaintiff does not acknowledge that the Rochester facility was lacking sufficient business contracts to remain open and profitable.

24. In fact, very soon after the announcement of the plant closure, Valeo received a contract from Ford Motor Company which was lucrative enough to warrant the Rochester facility staying open. Upon information and belief, Union officials were aware, prior to the ratification vote for the amended contract attained through "effects bargaining" that Valeo would be awarded this contract.

25. The company's announcement is misleading as Valeo will continue to perform the work associated with contracts previously fulfilled through the Rochester, NY facility at other of its facilities located in Ohio, Mexico and upon information and belief, China. As such, despite the use of the terminology "plant closure" the work is merely being relocated, inclusive of the work which will be done under the new Ford contract. In fact, upon information and belief the work previously being done at the Rochester facility will be performed at other facilities of the company in substantially the same manner.

26. Subsequent to the company's official announcement that it would close its Rochester facility, the Union requested that the company enter "Effects Bargaining" to determine the effect that the plant closing would have on every retired and active employee of the company.

27. Despite the company's steadfast threats to close the Rochester facility which predated its official announcement by many months, upon information and belief, the Union never seriously approached the company and/or its members at all in regard to presenting concessions to employees wages and/or benefits in an effort to keep the Rochester facility open.

28. Between January 1, 2005 and the date on which the company officially announced its decision to "close" the Rochester facility, the plaintiff was never apprised of any discussions between the Union and its members or between the Union and the company in an effort to keep the plant open.

29. No such discussions were requested by the Union despite the fact that the company had for many months been shipping equipment to other facilities and taking steps that were clearly indicative of the company's impending closure.

30. On or about September 25, 2005, the Union provided its members with the IUE Local 509 Meeting Notification booklet for the "Effects Bargaining Ratification Meeting". (Attached hereto as Exhibit B).

31. In the weeks leading up to the ratification vote for the agreements reached between the Union and the company during "Effects Bargaining", the Union engaged in a telephone campaign directed at retirees of the

company to entice them to come in and vote on the contract. Upon information and belief, the Union took this course of action to ensure that the amendments would pass by placing fear in the retirees minds that their benefits would be lost. Additionally, the Union officials were out in full force in the plant on virtually a daily basis with a presence on each shift "assuring" the employees that nothing further "could have been done".

32. In fact, the Union painted a picture to its employees that it "had two (2) choices, allow the contract to expire at 7/31/08, or go into Effects Bargaining". This was stated on page one of the booklet given to the plaintiffs at the September 25, 2005 ratification meeting.

33. The Union merely accepted the company's decision that it would not keep the plant open and thereby allowed the company to bargain only the effects of the closure.

34. Despite the fact that the company was relocating its Rochester work load as opposed to ceasing production or fulfillment of the contracts being performed in Rochester, the Union never challenged the designation of this occurrence as a "closure". If the Union had challenged the closure as being nothing more than a relocation of work, then together with other factors, the same would have necessitated the company to bargain the decision to close as it would have been a mandatory bargaining issue.

35. In negotiating the effect that the so-called closure of the facility would have upon the employees, the Union virtually disregarded the importance of seniority amongst its members.

36. Despite its obligation to negotiate in a manner designed to benefit the majority of its members, only approximately 180 of approximately 510 hourly employees received the greatest benefit from the contract negotiated by the Union to govern the effects of the "closure". However, the employees were not given sufficient information until after the ratification vote to realize the true negative impact this amendment had upon him/her.

37. At the meeting and while the votes were being counted, the attorney for the Union, Tom Kennedy, who was present at the meeting commented to certain of the employees that the "contract could have been more equitable".

38. In fact, subsequent to the ratification of the agreement, the Union has been significantly absent and unavailable for questions from the employees who receive the lesser of the benefits, but have greater seniority. Plaintiff and approximately 11 other employees who have high seniority, but who are receiving the smallest benefit were not even invited to attend a meeting at which information was distributed regarding employment opportunities in the

Rochester area and various other items designed to assuage the affects of the "closure were discussed.

39. Historically, seniority has been at the core of all of the collective bargaining agreements of this Union. Seniority has been given utmost importance and significance in the collective bargaining process and agreements reached. The collective bargaining agreements have all (including the original agreement that was amended through effects bargaining) given preference to its most senior employees in distributing benefits, vacation, and for purposes of lay off, recall from layoff and for various other employment decisions. Plaintiff and other employee/members were always told by Union officials that Valeo was "a seniority shop".

39 [sic]. However, despite the fact that all prior bargaining utilized seniority as the basic foundation upon which all bargaining was done, employees with far less seniority are reaping a greater benefit than plaintiff and other longer tenured employees due to the manner in which the attrition plans were designed.

40. Joe Giffi, Director of the International Union was present at the ratification meeting and gave a speech. At said meeting an employee of the Union commented on the issue of seniority. Mr. Giffi made the statement that "this has always been a seniority shop and remains a seniority shop". This statement was made prior to the vote thereby leading the employees to believe that the more senior employee benefitted by the proposed amendments to the contract.

41. The company admittedly hired consultants to provide advice on the costs associated with the proposals being negotiated, but the Union did not, upon information and belief, hire any consultants to ensure that the monies being used for the attrition programs would be dispersed with the greatest benefit going to its members with the greatest seniority. Or, in the alternative, to ensure that the members with the most seniority were not negatively impacted at the expense of less senior employees. The Union failed in its obligation to negotiate a fair and equitable amendment which would benefit the greatest number of its members.

42. In fact, a significant number of Union officials involved in the negotiations of "effects bargaining" and the Board members of the Union who voted to approve the amendments received the greatest benefit negotiated. As such, the negotiations and results therefrom were driven by many individuals who had a self-serving interest in the outcome.

43. Despite the fact that the amended agreement only requires an employee to sign up for the attrition program by a certain date in order to obtain the

attrition program for which he/she otherwise qualifies as set forth therein, subsequent to the ratification vote, the employees were provided with an Agreement and Release to sign to obtain the benefits to which he or she is otherwise entitled by virtue of the amendment to the Collective Bargaining Agreement.

44. No additional consideration, beyond which the plaintiff is entitled via the amendment to the Collective Bargaining Agreement is being provided by the Company or the Union in exchange for said Agreement and Release.

45. The manner in which said Agreement and Release is written results in the Union being a third party beneficiary of the Release. However, the Union misrepresented material facts to the plaintiff and other employees which resulted in the ratification of the agreement and failed to meet its duty of fair representation to the plaintiff and other union members. As such, it is not entitled to the protection of such a release due to its own intentional actions, negligent actions, reckless actions and omissions. Moreover, as stated prior, the entitlement flowing to the plaintiff and other employee/members is absolute under the terms of the amended contract without the need or requirement to sign said agreement and release.

46. The Union, via its representation of plaintiff through acceptance of his/her membership dues owed plaintiff a duty to fairly represent him/her in negotiations with the company.

47. Moreover, the Union had an obligation to disclose all facts that were relevant to the employees/union members in order that they could each cast their respective vote regarding the amended contract on the basis of a fully informed decision. Despite this obligation, the Union failed to disclose the fact that the Ford Contract would likely be awarded to Valeo and failed to disclose that it could have, and should have, challenged Valeo's position that this action was that of a plant "closure" versus a plant relocation.

48. Had the plaintiff and other employee/members been adequately informed or had the plaintiff received proper and appropriate information and representation from the Union the amendment that was ratified dictating the effects of the plant "closure" may have never come to be.

49. Even if there was no guarantee of successful outcome of bargaining in an effort to keep the Rochester facility open through concessions being made by the employee/union members, the Union owed an obligation to plaintiff and other employee/members to exhaust this course of remedy.

50. As a result of the Union's representations, omissions, and failure to meet its duty of fair representation of the plaintiff and other employee/members, the plaintiff suffered significant financial harm.

(Am. Compl. ¶¶ 5-50.)

As a result of the facts alleged above, Zagari raises two causes of action against the Union. They are as follows:

First: Breach of the Union's duty "of fair representation of Plaintiffs by acting in bad faith in failing to challenge the company's designation of its action as a plant closing instead of a relocation of the work, which released the company "from bargaining on the issue of the alleged plant closure/relocation which would have been an issue subject to mandatory bargaining." (Am. Compl. ¶ 52.)

Second: Fraudulent misrepresentation by David E. Roehrig ("Roehrig"), President of Local 509, and Mark A. Moochler ("Moochler"), Shop Chairman of Local 509, in July and August 2005, during informal conversations with employees, including plaintiffs, that the negotiations would benefit all of the employees, but that those employees with the most seniority would receive the greatest benefits; and by Joe Giffi ("Giffi"), President of the International Union, who was present during the informal conversations. (Am. Compl. ¶ 58.) Further, Zagari alleges that in an Information Bulletin dated August 1, 2005, provided by Local 509 to its membership and personally signed by Roehrig and Moochler, defendants stated that Valeo's Rochester plant was not viable; that negotiations would continue to obtain an exit package for employees; and that "[t]he things we want and expect are the same today as when we were hired twenty to thirty years ago. We want to leave with a fully vested pension, a health care plan and incentive money to help us start over if necessary. We do have the tools necessary to craft an attrition program that

<u>accomplishes these objectives</u>." (Am. Compl. ¶ 59 (emphasis added in Am. Compl.).)

Additionally, in the second cause of action, Zagari alleges that some time during the first

two weeks of September 2005,

> Specifically, those employees receiving the smallest benefit despite their greater seniority (Plaintiffs Eckert, Gadomski, Gimeli, Saiva, Uttaro, Van Pelt, Zagari and Gucciardo) were told by Dave Roehrig in respect to their benefits negotiated "I fucked up. You should have gotten more. But it's not done yet." They were told that after the vote the Union was going to take further action with respect to their situation and another group of employees known as the 1/10th group. Other employees such as plaintiffs Merchant and DiLorenzo were given misinformation as to their credited time and/or where they would fall into the new contract benefits.

(Am. Compl. ¶ 62.) It was not until after the ratification vote that these plaintiffs were told

by the Local and International Union representatives that nothing further would be done

on their behalf. (Am. Compl. ¶ 63.)

## STANDARDS OF LAW

### *Rule 12(b)(6) Standard*

Recently, the U.S. Supreme Court, in *Bell Atl. Corp. v. Twombly*, — U.S. —, 127

S.Ct. 1955 (May 21, 2007), clarified the standard to be applied to a 12(b)(6) motion:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id*. at 1964-65 (citations and internal quotations omitted).  *See also*, *ATSI Communications,*

*Inc. v. Shaar Fund, Ltd.*, — F.3d — ,  2007 WL 1989336 at  *5 (2d Cir. Jun. 11, 2007) ("To

survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Bell Atl. Corp. v. Twombly*) (footnote omitted); *Iqbal v. Hasty*, 490 F.3d 143, 2007 WL 1717803 (2d Cir. Jun. 14, 2007) (Indicating that *Bell Atl. Corp. v. Twombly* adopted "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible[,]" as opposed to merely conceivable.)  When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (1999), *cert. denied*, 531 U.S. 1052 (2000). On the other hand, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995)(*citing In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 400-01 n. 3 (2d Cir.1994)).

The Court, "[i]n considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6),…must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). Further, the Court must view the complaint, and draw all reasonable inferences, in the light most favorable to the non-moving party. *Id*.; *see also* 2 MOORE'S FEDERAL PRACTICE, § 12.34[1][b] (Matthew Bender 3d ed.) (court must accept plaintiff's factual allegations as true).

**Fed. R. Civ. P. 9(b)**

Rule 9(b) requires that allegations of fraud must state the circumstances of the alleged fraud with particularity. "Specifically, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

**Duty of Fair Representation**

Section 301 of the National Labor Relations Act, 29 U.S.C. § 185, permits employees to sue the labor organization that represents them. As the Supreme Court stated in *Ford Motor Co. v. Huffman*, 345 U.S. 330 (1953):

> The National Labor Relations Act, as passed in 1935 and as amended in 1947, exemplifies the faith of Congress in free collective bargaining between employers and their employees when conducted by freely and fairly chosen representatives of appropriate units of employees. That the authority of bargaining representatives, however, is not absolute is recognized in *Steele v. Louisville & N. R. Co.*, 323 U.S. 192, 198-199, in connection with comparable provisions of the Railway Labor Act. Their statutory obligation to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all of those members, without hostility to any. *Id.*, at 198, 202-204; *Tunstall v. Brotherhood of Locomotive Firemen*, 323 U.S. 210, 211; *Brotherhood of Railroad Trainmen v. Howard*, 343 U.S. 768.

*Huffman*, 345 U.S. at 337.

> The duties of a bargaining agent selected under the terms of the Act extend beyond the mere representation of the interests of its own group members. By its selection as bargaining representative, it has become the agent of all the employees, charged with the responsibility of representing their interests fairly and impartially.

*Wallace Corp. v. NLRB*, 323 U.S. 248, 255 (1944). In construing comparable provisions of the Railway Labor Act, the Supreme Court wrote,

> Without attempting to mark the allowable limits of differences in the terms of contracts based on differences of conditions to which they apply, it is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences.

*Steele v. Louisville & N. R. Co.*, 323 U.S. 192, 203 (1944).[3] The Second Circuit, in *Sim v. New York Mailers' Union No. 6*, 166 F.3d 465 (2d Cir. 1999), described the plaintiff's burden of proof as follows:

> It is well-established that a union has a duty to represent fairly all union members in the negotiation of a collective bargaining agreement. *See Spellacy* [*v. Airline Pilots Association-International*], 156 F.3d [120] at 126 [(2d Cir. 1998)] (*citing* [*Air Line Pilots Ass'n v.*] *O'Neill*, 499 U.S. 65, 74, 111 S. Ct. 1127, 113 L. Ed. 2d 51). This duty "is implied under the scheme of the National Labor Relations Act." *White v. White Rose Food*, 128 F.3d 110, 113 (2d Cir. 1997) (*citing DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 164, 76 L. Ed. 2d 476, 103 S. Ct. 2281 (1983)). "A union breaches its duty of fair representation if its actions 'can fairly be characterized as so far outside a wide range of reasonableness . . . that [they are] wholly arbitrary, discriminatory, or in bad faith.'" *Spellacy*, 156 F.3d at 126 (alterations in original) (*quoting O'Neill*, 499 U.S. at 67). Bad faith requires a showing of fraudulent, deceitful, or dishonest action. *See Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 531 (10th Cir. 1992).

*Sim*, 166 F.3d at 472.

## ANALYSIS

The Union bases its Rule 12(b)(6) motion to dismiss all the cases consolidated with *Zagari* on the following arguments: (1) Plaintiffs failed to allege substantial evidence of fraud in that the allegedly fraudulent statements by Union officials "are so vague they promise nothing to the union members" and all employees had a booklet which explicitly warned that thirteen members (including plaintiffs) "'cannot reach pension eligibility due to

---

[3] *Steele* dealt with race discrimination.

a young age and/or not enough credited service'"[4]; (2) Plaintiffs do not allege, and even if they had, could not prove that the 2005 amendments would not have been ratified had the alleged misrepresentations not been made since the amendments passed by hundreds of votes and plaintiffs number approximately 87. After reviewing the amended complaint and the documents upon which Plaintiff relied or which he referenced, the Court determines that Plaintiff's factual allegations are sufficient to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Plaintiff's first cause of action alleges breach of the Union's duty of fair representation by acting in bad faith when the Union failed to challenge Valeo's designation of its action as a plant closing instead of a relocation of the work, which had the effect of releasing the company "from bargaining on the issue of the alleged plant closure/relocation which would have been an issue subject to mandatory bargaining." (Am. Compl. ¶ 52.) To establish a claim of a breach of the duty of fair representation through bad faith, the Supreme Court has written that:

> [the plaintiff] must have proved "arbitrary or bad-faith conduct on the part of the Union." *Vaca v. Sipes*, 386 U.S. 171] *supra*, at 193 [1967]. There must be "substantial evidence of fraud, deceitful action or dishonest conduct." *Humphrey v. Moore*, *supra*, 375 U.S. [335], at 348 [1964].

*Amalgamated Ass'n of St., Elec. Ry. and Motor Coach Emp. of America v. Lockridge*, 403 U.S. 274, 299 (1971). The conduct alleged by Plaintiff here is contained in paragraphs 27-29 and 32-34 of the amended complaint. Plaintiff maintains that those allegations support

---

[4](Def.s' Mem. of Law, at 10 (quoting IUE Local 509 Meeting Notification, at 4 (attached as Ex. F. To Fusco Aff.)).)

his argument that the Union acted in bad faith.[5] The Union responds that the statements Plaintiff attributes to Roehrig, Moochler and Giffi do not amount to "material misrepresentations, a necessary element to establish a cause of action based on fraud." (Def.s' Mem. of Law (Docket No. 20) at 5.) In support of this argument, the Union relies on *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387 (2d Cir. 2001). In that case, the Second Circuit wrote:

> Under New York law, the essential elements of a fraud claim include "repre-sentation of a material existing fact, falsity, scienter, deception, and injury." *New York Univ.*, 639 N.Y.S.2d at 289 (internal quotation marks omitted); *see Bridgestone/Firestone*, 98 F.3d at 19 (to prove fraud under New York law, plaintiff must show "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance") (internal quotation marks omitted).

*Manning*, 254 F.3d at 400. Furthermore, the Union argues that even if Plaintiff has sufficiently alleged material misrepresentations, he "must also demonstrate a causal connection between the union's wrongful conduct and the plaintiff's injuries." *Spellacy v. Airline Pilots Ass'n-Int-l*, 156 F.3d 120, 126 (2nd Cir. 1998)." (Def.s' Mem. of Law at 4.)

Here, Plaintiff is alleging that the Union lied when it represented to him that the *only* option in response to Valeo's plant closing announcement was to engage in effects bargaining, thereby failing to confront Valeo with mandatory bargaining on what Plaintiff alleges was in reality just a work relocation. Plaintiff further asserts that had the Union done so, it is possible that Valeo would have been prevented from closing its Rochester plant,

---

[5]"The plaintiffs have alleged in this matter that the Union failed in its representation of them by lying to them. They lied by telling them that they had only two options upon learning of Valeo's closure announcement. They lied by telling them that their seniority was always and is still being taken into account. They lied by telling them that the members with the most seniority were receiving the greatest benefits." (Pl.s' Mem. of Law at 14.)

thereby preserving plaintiff's job. That point is made in Plaintiff's memorandum of law as follows:

> However, what plaintiffs are stating is that when the Union voluntarily, or in response to inquiries, chooses to state what it did or did not do or what it did or did not take into consideration, then the Union must not act in bad faith or seek to deceive its members.
>
> In the instant matter, the Union represented to its members at the time of the announcement of the plant closure that it had only two options: "Following the announcement of the plant closing we had two (2) choices, allow the contract to expire at 7/31/08, or go into Effects Bargaining. Effects Bargaining is the term used for defining what affect the plant closing will have on every retired and active employee." (See Fusco Exhibit F, pg. 1 of Exhibit).
>
> This was not truthful. In fact, it did have the option to request negotiations to keep the facility open for which the company's participation would have been mandatory.

(Pl.'s Mem. of Law at 19.) In this regard, the Court determines that Plaintiff has sufficiently plead a cause of action for breach of the duty of fair representation and a causal connection between the alleged misrepresentations and Plaintiff's injuries.

With regard to the second cause of action, Plaintiff alleges that the Union misrepresented that the 2005 amendments to the collective bargaining agreement would benefit the most senior employees the greatest. The Union responds to the allegations in the amended complaint by arguing that no cause of action for fraudulent misrepresentation lies where, as here, the written materials disclosed that some members with seniority would have too little credited service or be too young to retire with full benefits. Plaintiff counters that, "[a]lthough, the handout described each category into which each employee/member presumably fell, it was virtually impossible to determine which category applied to each individual." (Pl.'s Mem. of Law at 20-21.) The New York Appellate Division, First

Department, held in *First Nat'l State Bank v. Irving Trust Co.*, 91 A.D.2d 543 (N.Y. App. Div.

1982):

> "However limited may be the duty to probe the truthfulness of a representation (*see* Prosser on Torts [2d ed.], pp. 552-553; Restatement, Torts, § 540), there can be no liability in fraud where the complaining party is, in advance, fully knowledgable and apprised of those matters as to which the representations are alleged to have deceived." (*200 East End Ave. Corp. v General Elec. Co.*, 5 AD2d 415, 418, *affd* 6 NY2d 731.)

*Id*. at 544. Accepting the facts in the amended complaint as true, the Court determines that

Plaintiff has sufficiently alleged that he was not fully knowledgable about the actual bargain

struck between the Union and Valeo in 2005 and, therefore, reasonably relied on what he

claims turned out to be misrepresentations by Union officials that his seniority was

respected in the amendments to the collective bargaining agreement.

Accordingly, the Court determines that Plaintiff has presented a plausible claim that

Union officials acted fraudulently, deceitfully, or dishonestly and that their acts lead to

Plaintiff's injuries. That is, the Court finds the allegations in the amended complaint are

sufficient under the Supreme Court's recent standard to avoid dismissal at this stage of the

litigation.

## CONCLUSION

For the foregoing reasons, Defendants' motion (# 20) to dismiss is denied.

IT IS SO ORDERED.

Dated:   December 7, 2007
       Rochester, New York       ENTER:


                /s/ Charles J. Siragusa
                CHARLES J. SIRAGUSA
                United States District Judge